# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 24003**

_____

**UNITED STATES**
*Appellee*

**v.**

**Christopher P. MOOTY II**
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary[1]

Decided 17 July 2025

_____

*Military Judge*: Bradley J. Palmer.

*Sentence*: Sentence adjudged 7 June 2023 by SpCM convened at Royal Air Force Alconbury, United Kingdom. Sentence entered by military judge on 5 July 2023: Hard labor without confinement for 20 days, reduction to E-2, and a reprimand.

*For Appellant*: Major Megan R. Crouch, USAF; Major Jennifer M. Harrington, USAF.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and MENDELSON, *Appellate Military Judges*.

Judge MENDELSON delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

_____

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), *Manual for Courts-Martial, United States* (2024 ed.).

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

MENDELSON, Judge:

A special court-martial consisting of a military judge convicted Appellant, contrary to his pleas, of one specification of drunken operation of a vehicle, in violation of Article 113, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 913.[2] The military judge sentenced Appellant to hard labor without confinement for 20 days, reduction to E-2, and a reprimand. The convening authority took no action on the findings or sentence.

Appellant raises two issues on appeal, which we restate as: (1) whether the finding of guilty is factually sufficient; and (2) whether referral of this case to the forum of a military judge alone special court-martial violates the Due Process Clause of the Fifth Amendment.[3]

Additionally, we specified the following issue: (3) whether, in light of *Hemphill v. New York*, 595 U.S. 140 (2022), the military judge violated Appellant's Sixth Amendment[4] right to confrontation by admitting testimonial hearsay after finding the Defense opened the door to the admission of the evidence, and if so, whether Appellant is entitled to relief.

With respect to issue (3), we find error that materially prejudices Appellant's substantial rights. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, we set aside the findings and the sentence and authorize a rehearing. Given our resolution of issue (3), no discussion is warranted for issues (1) and (2).[5]

———————————————

[2] Unless otherwise noted, references in this opinion to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[3] U.S. CONST. amend. V.

[4] U.S. CONST. amend. VI.

[5] We note this opinion is issued more than 18 months after Appellant's case was docketed with this court, which constitutes a facially unreasonable delay. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Because we set aside the findings and sentence on other grounds, we find it unnecessary to further address this issue in this opinion.

## I. BACKGROUND

### A. The Night in Question

The charge stems from a night that Appellant spent out with two friends from his unit, Senior Airman (SrA) JE and SrA TTH. The night began with Appellant leaving his car parked at SrA JE's house before meeting SrA JE and SrA TTH at a pub in Newmarket, United Kingdom, between 2200 and 2230 hours on 3 March 2023. According to SrA TTH, Appellant had about two to three bottles of beer at the pub. After spending approximately two hours at the pub, the group took a taxi to a club where Appellant had approximately two to three mixed drinks. After about two hours at the club, the group then took another taxi to SrA JE's home in Bury Saint Edmunds, United Kingdom, about 23 minutes away.

The group spent about half an hour at SrA JE's home before deciding they were hungry and wanted to get something to eat. At that point, at about 0400 to 0430 hours on 4 March 2023, Appellant drove the group in his car to a kebab shop about 10 to 15 minutes away. While driving, Appellant received Instagram[6] messages on his cell phone from RH, a woman who was "not necessarily" his girlfriend but who was in "some type of relationship" with him. Appellant handed his phone to SrA TTH and asked him to type out a response to RH explaining that Appellant was driving at the moment. RH responded accusing Appellant of driving drunk and threatening to report him. After getting kebabs, Appellant dropped his two friends off at SrA JE's house and left.

According to SrA TTH—the only testifying witness at trial who saw Appellant that night—when Appellant drove from SrA JE's house to the kebab shop and back, Appellant was not showing any signs of intoxication. Specifically, Appellant did not look intoxicated, was walking normally, was speaking normally, and was driving normally. In contrast to Appellant, SrA TTH could tell that SrA JE was intoxicated.

### B. RH's Report that Appellant Drove Drunk

RH sent a message to the Royal Air Force Mildenhall Public Affairs office alleging Appellant drove drunk from Newmarket to Bury Saint Edmunds, United Kingdom, referring to the night in question. The message was forwarded to Appellant's commander, who in turn forwarded it to Appellant's First Sergeant, Senior Master Sergeant (SMSgt) GH, to "look into" the matter.

During the investigation, SMSgt GH exchanged emails with RH. In the email exchange, SMSgt GH explained that he was reaching out regarding RH's

---

[6] Instagram is a social networking application that includes a private messaging feature between users.

message that Appellant drove drunk and confirmed with RH that she agreed to use email as "official communication." SMSgt GH requested additional evidence and asked RH what outcome she was seeking by making the report. In response, RH provided screenshots of Instagram messages she exchanged with Appellant, answered questions, stated she wanted Appellant to have consequences for his actions, and referred to Appellant as a criminal.

SMSgt GH asked RH whether Appellant told her how much he drank and whether she saw him that night. RH responded by stating: "[Appellant] did not tell me how much he drank but yes I saw him and I have seen him under the influence before but this time was genuinely the most drunk I've ever seen him."

## C. Instagram Messages RH provided to SMSgt GH

The screenshots RH provided to SMSgt GH start with the message SrA TTH typed on behalf of Appellant, explaining that Appellant was driving at the moment.[7] In the remainder of the messages, Appellant asks if he can come see RH, while RH angrily accuses Appellant of driving drunk and threatens to report him:

> 3:46[8]
>
> [Appellant:[9,10]] [Appellant] is driving right now so his message not be exactly what hes trying to say but he means well
>
> [RH:] HES F[**]KING WHAT
>
> HAHAHAHAHAHAHA
>
> Incredible
>
> Honestly f[**]king incredible

---

[7] With the exception of the bracketed portions, quotes from the Instagram messages appear throughout this opinion in their original form without correction.

[8] A time stamp appears at the top of each screenshot. There is no indication of time or date next to the messages themselves.

[9] The messages labeled as coming from Appellant were identified by Appellant's profile photo next to the start of each message. Ultimately, the messages labeled as coming from Appellant were admitted as statements by a party-opponent, while the messages from RH were admitted only for the effect on Appellant and not for the truth of the matter asserted.

[10] SrA TTH testified that he typed out this first message on Appellant's phone while Appellant was driving the group to the kebab shop.

4

I should just tell base en

Rn

Also nothing about lying to my face is "meaning well"

3:46

[Appellant:] Can i come see you?

I just dropped [SrA JE's] dumb a[**] off

[RH:] Hope you get caught

After f[**]king screaming about it so much

You actually do itm

Unreal

Youre f[**]king unbelievable

[Appellant:] Yeah i understand. If you cba to see me

[RH:] Not like you can go back to base [clown emoji]


3:47

[Appellant:] I can stay here. I would just rather see you

[RH:] Then come here

Why the f[**]k did you drive

[Appellant:] Because [SrA JE] is a f[**]king retard

[RH:] Oh yes let's blame the passenger shall we

[Appellant]: And he got lost somewhere in bury

[RH:] One word: taxi

[Appellant]: Im not blaming him im telling you whats goong on


3:47

[RH:] Two words: google maps

[Appellant:] Hes pissed rn

[RH:] SO ARE YOU

AMD YOU F[**]KING DROVE

YET YOU WOULDNT COME AND SEE ME AF-
TER ONE BOTTLE

No f[**]king offence mate but even if my dear old
nan was lost I wouldn't be f[**]king driving

[Redacted message[11]]


3:47

[Appellant:]  Youre right

[RH:]  Anyway thanks for the proof I can show your boss
:)

[Appellant:]  Im just trying to be superman

[Crying emoji]

If youre gonna incriminate me then just get it over
with.


7:35

[RH:]  So

I'm gonna try again

[Appellant]

Do you remember drunk driving to my house

[Appellant:]  Yes whats going on

**D. The interview**

On 8 March 2023, SMSgt GH conducted an interview of Appellant to investigate RH's allegation. Master Sergeant (MSgt) JC and MSgt SC were also present to observe the interview.

At the outset of the interview, Appellant was advised that the command received an allegation, and Appellant was shown a pre-filled Air Force (AF)

---

[11] The military judge ruled this portion of the text inadmissible under Mil. R. Evid. 403.

Form 1168, *Statement of Suspect/Witness/Complainant*,[12] stating he was suspected of the offense of "Article 113 – Drunken or reckless operation of a vehicle, aircraft, or vessel." The interviewers "walked through" the AF Form 1168 with Appellant, to include the portion on the form stating the offense he was suspected of and his right to request a lawyer at any time during the interview.

The first question posed to Appellant was whether he "operated a motor vehicle within the last week with alcohol in his system" or "have you operated a vehicle after drinking alcoholic beverages?"[13] Appellant initially responded, "No." Appellant was then asked "if he had any idea why someone would make an allegation of him operating a motor vehicle under the influence of alcohol," to which he responded he did not know. MSgt SC testified that when Appellant was asked about what he did the prior weekend, "[Appellant] said that he had gone out to a pub with friends, had a beer. That he had gone to get food, gone to a club, had a few vodka Red Bulls there, and then split a taxi ride home." MSgt SC clarified, "To the best of my knowledge, [Appellant] stated that he had had one beer at the pub, and two to three vodka Red Bulls at the club."

Appellant was then asked again "why he thought someone would report him." Appellant again responded that he did not know why. At that point, Appellant was shown the screenshots that RH emailed to SMSgt GH.

After the Instagram messages were read to Appellant, SMSgt GH asked Appellant if he had any comments to make. Appellant responded, "[N]o, I'd like to talk to someone." SMSgt GH then asked Appellant to clarify what he meant by his statement that he would like to talk to someone. According to MSgt SC's testimony at trial, Appellant then responded: "[Y]ou clearly have all the evidence you need. I'm not going to hide anything, yes I did." According to MSgt JC's testimony at trial, Appellant responded, "[W]hat's the point, you know I did it."

### E. Military Judge's Initial Ruling Excluding RH's Out-of-Court Statements

RH was issued a summons to testify at trial but refused to appear. Trial defense counsel filed a pretrial motion to suppress RH's out-of-court statements made in her email communications with SMSgt GH, including the

---

[12] The principal purpose of the form is to record information and details of criminal activity which may require investigative action by commanders, supervisors, Air Force entities conducting law enforcement functions, and to provide information to appropriate individuals within Department of Defense organizations who ensure proper legal and administrative action is taken.

[13] Only MSgt SC and MSgt JC testified during trial, and each testified to slightly different wording of the first question Appellant was asked.

statement that Appellant was "the most drunk I've ever seen him." The military judge ruled that RH's unconfronted statements were testimonial and thus excluded them under the Confrontation Clause.

## F. Military Judge's Subsequent Ruling that the Defense Opened the Door to RH's Out-of-Court Statement

At trial, the defense theory was that the Government presented no evidence that the level of intoxication was sufficient to impair the rational and full exercise of Appellant's mental or physical capabilities, a required element of the sole offense of drunken operation of a vehicle. In line with the defense theory, during cross-examination of MSgt SC, trial defense counsel asked a series of questions eliciting testimony that there were no reports of Appellant displaying specific signs of impairment, such as driving poorly, slurred speech, or bloodshot eyes:

> [Trial Defense Counsel (DC)]: . . . So, I want you to answer what you know or what you don't know and not anything that's in the mind of anyone else OK?
>
> [MSgt SC]: Okay.
>
> [DC]: You received no report saying that [Appellant] failed to yield, correct?
>
> [MSgt SC]: No.
>
> [DC]: You received no report that he took too long to stop, correct?
>
> [MSgt SC]: No.
>
> [DC]: You received no report that he was running over the curb, correct?
>
> [MSgt SC]: No.
>
> [DC]: You received no report that [Appellant] was making extra wide turns on the road, isn't that correct?
>
> [MSgt SC]: That's correct, I did not receive a report like that.
>
> [DC]: And you received no report from any witness or information that [Appellant] was slurring his words, correct?
>
> [MSgt SC]: I did not.
>
> [DC]: You received no information or report that [Appellant] had bloodshot eyes, correct?
>
> [MSgt SC]: I did not.

> [DC]: And you received no information or report that [Appellant] smelled of alcohol, correct?
>
> [MSgt SC]: I did not.

At that point, trial counsel objected to the line of questioning on the basis that it called for evidence of whether Appellant displayed signs of "drunkenness" while the military judge's earlier ruling precluded discussion of RH's statement that Appellant was drunk. Trial counsel argued that MSgt SC's answers were "trying to avoid the fact that he's aware of the report he did receive of those same things." The military judge overruled the objection. However, the military judge also instructed MSgt SC that if defense counsel "[a]sks you a question that you believe calls for information that you may have seen from [RH] . . . [y]ou can answer that question." The military judge reasoned that trial defense counsel can waive their objection to RH's statement, and further instructed that trial counsel would be allowed the opportunity to "clarify" MSgt SC's responses to the Defense's line of questioning.

On redirect examination, trial counsel asked MSgt SC, "[W]ere any of your answers just now affected by the fact that you were under the impression you're not allowed to talk about allegations you may or may not have received from [RH]?" MSgt SC answered that he would have responded differently to the question of whether there was a report of Appellant having bloodshot eyes based on the statement in RH's email concerning her perception of how drunk Appellant was. Trial defense counsel objected, and after hearing argument from both sides, the military judge ruled that trial defense counsel's questioning—specifically concerning whether the witness received any information or report that Appellant had bloodshot eyes—opened the door to RH's testimonial hearsay that had been previously excluded. Specifically, the military judge reasoned:

> I'm not finding that there's been some big door open to every statement [RH] made but with regards to that specific question that defense counsel answered [sic]. The witness may answer what – with what he believed to be responsive. Even though that evidence had previously been excluded. Because the right to confrontation is the accused's right. And there was a question by defense counsel that arguably called for that particular answer.

The military judge then re-asked the witness the question, "Did you receive any reports or information that [Appellant] had bloodshot watery eyes?" The witness responded:

> Your Honor, thank you. Command received an e-mail from [RH]. That stated something to the effect of that she had – had seen him intoxicated, or other people intoxicated. And he was more

drunk, or something to that effect. If I could see the e-mail, I could speak to it clearly but.

The military judge interjected, "So at this point we're going to – we'll rest on that particular answer. I'm not going to go any further. So, I'm going to allow that answer and I will consider that answer."

## II. DISCUSSION

The admission of MSgt SC's testimony—recounting RH's out-of-court statement to the effect that Appellant was more drunk than she had ever seen him before—violated Appellant's Sixth Amendment right to confrontation. The error was not harmless beyond a reasonable doubt.

### A. Law

We review a military judge's ruling on the admission or exclusion of evidence for an abuse of discretion. *United States v. Katso*, 74 M.J. 273, 278 (C.A.A.F. 2015) (footnote omitted).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The United States Supreme Court has held that "'the text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts" but rather the requirement "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Crawford v. Washington*, 541 U.S. 36, 53 (2004) (citation omitted). As such, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59 (2004) (footnote omitted). "[A] statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *United States v. Sweeney*, 70 M.J. 296, 301 (C.A.A.F. 2011) (quoting *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010)). "To rank as testimonial, a statement must have a primary purpose of establishing or proving past events potentially relevant to later criminal prosecution." *Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6 (2011) (internal quotation marks and citations omitted).

While "in certain circumstances, defense counsel may waive constitutional rights on behalf of their clients," "the Supreme Court long ago . . . stat[ed] that there is 'a presumption against the waiver of constitutional rights.'" *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008) (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966) (citing *Glasser v. United States,* 315 U.S. 60, 70–71 (1942)). "Waiver can occur either by operation of law," such as an unconditional

guilty plea, "or by the 'intentional relinquishment or abandonment of a known right.'" *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (quoting *Sweeney*, 70 M.J. at 303) (citing *United States v. Hardy*, 77 M.J. 438, 441–42 (C.A.A.F. 2018)). The Supreme Court has held that waiver need not be express; an implied waiver can be established through a "course of conduct indicating waiver." *Berghuis v. Thompkins*, 560 U. S. 370, 383–84 (2010) (quoting *North Carolina v. Butler*, 441 U. S. 369, 373 (1979)).

The Supreme Court more recently addressed the issue of whether the defense waives the right to confrontation by "opening the door" to testimonial hearsay to correct a misleading impression created by the defense theory. *Hemphill v. New York*, 595 U.S. 140 (2022). While "the Sixth Amendment leaves . . . flexibility to adopt reasonable procedural rules governing the exercise of a defendant's right to confrontation," the Court clarified that it "has not held that defendants can 'open the door' to violations of constitutional requirements merely by making evidence relevant to contradict their defense." *Id.* at 151, 154. The Court explained that the Sixth Amendment right to confrontation "admits no exception for cases in which the trial judge believes unconfronted testimonial hearsay might be reasonably necessary to correct a misleading impression." *Id.* at 154. The Court held that the admission of "unconfronted, testimonial hearsay against [the defendant] simply because the judge deemed his presentation to have created a misleading impression that the testimonial hearsay was reasonably necessary to correct" was "antithetical to the Confrontation Clause." *Id.* at 153.[14] Trial judges, however, are not left without recourse to protect against misleading evidence, as a trial judge "generally retains the authority to withdraw it, strike it, or issue a limiting instruction as appropriate." *Id.* at 155.[15]

Where a Confrontation Clause objection is preserved and there is error, relief will be granted unless the error was harmless beyond a reasonable doubt, considering such factors as: (1) "the importance of the unconfronted testimony in the prosecution's case;" (2) "whether that testimony was cumulative;" (3) "the existence of corroborating evidence;" (4) "the extent of [cross-examination] permitted;" and (5) "the strength of the prosecution's case." *Sweeney*, 70 M.J. at 306 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 683 (1986)).

---

[14] The Court left open the question of the validity of the common-law rule of completeness as applied to testimonial hearsay. *Id.* at 155.

[15] "[W]ell-established rules," such as Military Rule of Evidence 403, "permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 155 (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)).

> The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction . . . . An error is not harmless beyond a reasonable doubt when there is a reasonable possibility that the error complained of might have contributed to the conviction.

*United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016) (internal quotation marks and citations omitted). The party benefiting from a constitutional error bears the burden of demonstrating the error was harmless beyond a reasonable doubt. *United States v. Kreutzer*, 61 M.J. 293, 300 (C.A.A.F. 2005) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

## B. Analysis

As an initial matter we note that the military judge found RH's out-of-court statement characterizing Appellant as "the most drunk" she had ever seen him to be a testimonial statement, and the Government does not challenge that finding on appeal. We agree that RH's statement has all the indicia of a testimonial statement: in messaging Appellant on the night in question, RH accused Appellant of driving drunk and told Appellant she had "proof" to report to his "boss;" RH followed through with her threat to report Appellant by sending a message to the base stating that Appellant drove drunk; RH told SMSgt GH that she wanted Appellant to face consequences for his actions and referred to Appellant as a criminal; and RH provided the statement at issue in response to SMSgt GH's request for additional evidence regarding her report. We have no hesitation in finding RH's statement had "a primary purpose of establishing or proving past events potentially relevant to later criminal prosecution." *Bullcoming*, 564 U.S. at 659 n.6 (2011) (internal quotation marks and citations omitted).

The military judge initially suppressed RH's statement on the basis that it amounted to testimonial hearsay and RH was not available for cross-examination. However, during trial the military judge later found that the Defense opened the door to RH's testimonial hearsay when the Defense cross-examined MSgt JC on whether he had received any information or report of Appellant displaying specific signs of impairment while driving on the night in question—such as a failure to yield, taking too long to stop, driving over the curb, taking a wide turn, slurring his words, having bloodshot eyes, or smelling of alcohol. In making his ruling, the military judge specifically focused on the question of whether MSgt JC had received any information or report that Appellant had bloodshot eyes. The military judge found that specific question opened the door to RH's testimonial hearsay because it "arguably called for that particular answer," and noted that the Defense can waive their Confrontation Clause objection.

The military judge abused his discretion in finding waiver based on a theory that the defense questioning opened the door or "called for" the testimonial hearsay of RH. It is undisputed that the Defense maintained their objection to the testimonial hearsay, and at no point did the Defense intentionally relinquish or abandon the right to confrontation. *See Jones*, 78 M.J. at 44; *Sweeney*, 70 M.J. at 303. Likewise, the Defense did not engage in a "course of conduct indicating waiver." *Berghuis*, 560 U. S. at 384. The line of cross-examination supported the defense theory that there is no evidence of intoxication sufficient to impair the rational and full exercise of mental or physical capabilities, a required element of the offense. The questions were narrowly tailored to specific signs of impairment, and RH's statement did not report any of the specific signs of impairment that the Defense inquired about. The circumscribed line of questioning did not "call for" RH's conclusory accusation characterizing Appellant as "drunk."

In allowing the witness to "clarify" his response by testifying to RH's statement, it appears the military judge's concern was that the defense theory and line of questioning created a misleading impression that no one reported that Appellant appeared "drunk" on the night in question. The Supreme Court has made clear that the admission of unconfronted testimonial hearsay to correct a misleading impression is "antithetical to the Confrontation Clause." *Hemphill*, 595 U.S. at 153. The defense cannot "'open the door' to violations of constitutional requirements merely by making evidence relevant to contradict their defense." *Id.* at 154. As *Hemphill* explains, the military judge retained authority to protect against misleading evidence by striking the testimony, but had no authority to violate the constitutional requirement of confrontation. *Id.*

Having found that the admission of the testimonial hearsay violated Appellant's right to confrontation, we must now determine whether that constitutional error was harmless beyond a reasonable doubt. *See Sweeney*, 70 M.J. at 306 (citing *Van Arsdall*, 475 U.S. at 683). We are not convinced beyond a reasonable doubt that the error did not contribute to the verdict. *See Hills*, 75 M.J. at 357.

For Appellant to be convicted of the offense of drunken operation of a vehicle in violation of Article 113, UCMJ, as charged, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant operated or was in physical control of a vehicle; and (2) that while operating or in physical control of a vehicle, Appellant was drunk.[16] *MCM*, pt. IV, ¶ 51.a.(a)(2).

---

[16] The second element can alternatively be met with an alcohol concentration in the accused's blood or breath equal to or in excess of 0.08 grams of alcohol per 100

The term "drunk" is used in relation to intoxication by alcohol and is defined as "any intoxication which is sufficient to impair the rational and full exercise of the mental or physical faculties." *Id.* ¶ 51.b.(6).

The evidence admitted at trial consists of SrA TTH's testimony, Appellant's statements in the Instagram messages with RH, Appellant's statements made during the interview (as testified to by MSgt JC and MSgt SC), and RH's unconfronted testimonial hearsay that Appellant was more drunk than she had seen him before.

The undisputed evidence establishes that Appellant consumed alcohol and that, after taking taxis during the night while out drinking, he then drove his vehicle early the next morning. But the offense is not established merely by drinking and then later driving. There must be evidence establishing beyond a reasonable doubt that Appellant's level of intoxication at the time he drove was "sufficient to impair the rational and full exercise of the mental or physical faculties."

While it is imaginable that under some factual scenario the sheer amount of alcohol consumed and the proximity of time might establish beyond a reasonable doubt intoxication of a level sufficient to impair the rational and full exercise of the mental or physical faculties, we do not find it to be the case here. The drinking—anywhere between three to six drinks total—spanned over a four-hour period, followed by a 23-minute taxi ride and then approximately 30 more minutes spent at SrA JE's house before Appellant drove. While there is evidence that Appellant drank beer at the first establishment and mixed vodka cocktails at the second establishment, there is simply no evidence concerning the actual amount of alcohol contained in each drink nor is there any evidence relating to Appellant's size. The evidence also lacks any expert testimony to establish how the alcohol would have metabolized in his system over time or how it would have impaired his faculties. Moreover, there is no evidence that Appellant's driving performance indicated impairment such as speeding, swerving, or committing any traffic violations.

SrA TTH was the only eyewitness who testified at trial. SrA TTH recognized that SrA JE was very drunk, but in contrast testified that Appellant did not display any signs of impairment. According to SrA TTH, Appellant was

---

milliliters of blood or per 210 litters of breath, as shown by chemical analysis, or in the case of operating a vehicle outside the United States, by such lower limit as the Secretary of Defense may by regulation prescribe. *MCM*, pt. IV, ¶¶ 51.a.(a)(2), 51.a.(b)(1)(B), 51.a.(b)(3). However, the Government did not charge the second element with a blood or breath alcohol concentration level, and did not introduce any evidence at trial concerning a blood or breath alcohol concentration.

speaking, walking, and driving normally. It is also notable that Appellant's faculties were sufficient for him to realize he should not type up a response to RH's Instagram messages while driving—he handed his phone to SrA TTH and dictated the response to him.

The Government contends that the offense was proven beyond a reasonable doubt based on Appellant's statements alone, as corroborated by the testimony of SrA TTH. We are not convinced.

While Appellant appears to acquiesce to RH's accusations in the Instagram messages, the meaning of Appellant's statements cannot be fully understood—without any testimony clarifying the context or subtext—given the nature of the communication. The messages are riddled with shorthand and abbreviations that are subject to multiple meanings.

There are two portions of the conversation that the Government characterizes as an admission of being "drunk." The first is the following:

| | |
|---|---|
| [Appellant:] | Hes pissed rn |
| [RH:] | SO ARE YOU |
| | AMD YOU F[**]KING DROVE |
| | YET YOU WOULDNT COME AND SEE ME AFTER ONE BOTTLE |
| | No f[**]king offence mate but even if my dear old nan was lost I wouldn't be f[**]king driving |
| | [Redacted message[17]] |
| [Appellant:] | Youre right |

Without further clarification, it is impossible to know whether Appellant's statement "Youre right" was meant as "you are right, I'm pissed," or "you are right that I wouldn't come and see you after one bottle," or "you are right that you wouldn't drive even if your dear old nan was lost," or whether it was a response to the last line of RH's message which was redacted.

The second portion the Government characterizes as an admission is Appellant's final response at the end of the messages:

| | |
|---|---|
| [RH:] | So |
| | I'm gonna try again |

---

[17] The military judge ruled this portion of the text inadmissible under Mil. R. Evid. 403.

> [Appellant]
>
> Do you remember drunk driving to my house

[Appellant:] Yes whats going on

Again, it is unclear which line of RH's multiple messages Appellant responded to. There are no time stamps on the messages themselves; it is possible that Appellant typed "Yes whats going on" as a response to the first few lines before he even read the last line of RH's message. And even with the most liberal reading of the messages in their full context, there is a reasonable possibility that Appellant merely acknowledged that he drove to RH's house after drinking on some occasion.

Perhaps the strongest evidence is the statement Appellant made at the end of the interview after being confronted with the Instagram messages. According to the two versions testified to at trial, Appellant either stated: "[Y]ou clearly have all the evidence you need. I'm not going to hide anything, yes I did;" or, "[W]hat's the point, you know I did it." While Appellant was advised at the beginning of the interview that he was suspected of the offense of "Article 113 – Drunken or reckless operation of a vehicle, aircraft, or vessel," context and words matter. There is no indication that Appellant was advised of the legal definition of "drunk"—intoxication sufficient to impair the rational and full exercise of the mental or physical faculties. SMSgt GH began questioning Appellant by asking whether he operated a motor vehicle with alcohol in his system or after drinking alcoholic beverages. Thus, by admitting that he "did it," there is a reasonable possibility that Appellant only meant that he did operate a motor vehicle after drinking or with alcohol in his system. The interview ended at that point, so there was no further clarification of whether Appellant admitted that his faculties were impaired at the time he drove.[18]

The only evidence at trial that addressed Appellant's level of impairment was SrA TTH's testimony that Appellant did *not* display any signs of impairment while driving, and RH's statement to the effect that Appellant was more drunk than she had ever seen him. Given the lack of other evidence indicating that Appellant's faculties were impaired at the time he drove, we conclude the

---

[18] We also acknowledge that Appellant made initial statements at the outset of the interview denying that he recently drove after drinking alcohol, but we find that those statements are more akin to a general denial of guilt, rather than false exculpatory statements that would infer a consciousness of guilt. *See United States v. Colcol*, 16 M.J. 479, 484 (C.M.A. 1983) ("unlike a false explanation or alibi given by a suspect when he is first confronted with a crime, [a] general denial of guilt does not demonstrate any consciousness of guilt").

erroneous admission of the unconfronted testimonial hearsay contributed to the conviction.

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. A rehearing is authorized. The record of trial is returned to The Judge Advocate General for further proceedings consistent with this opinion. *See* Article 66(f), UCMJ, 10 U.S.C. § 866(f).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court