# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40249**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Derek N. MOSS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 April 2023

————————————

*Military Judge:* Elijah F. Brown (arraignment and motions); Christina M. Jimenez (motions and trial).

*Sentence:* Sentence adjudged on 10 September 2021 by GCM convened at Cannon Air Force Base, New Mexico. Sentence entered by military judge on 17 November 2021: Bad-conduct discharge, confinement for 10 months, and reduction to E-1.

*For Appellant:* Major Megan E. Hoffman, USAF.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GOODWIN, and GRUEN, *Appellate Military Judges*.

Judge GOODWIN delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

GOODWIN, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of wrongfully viewing child pornography in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934.[1] The military judge sentenced Appellant to a bad-conduct discharge, confinement for ten months, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises four issues for our consideration which we have reordered and reworded: (1) whether Appellant's conviction is legally and factually sufficient; (2) whether trial defense counsel were ineffective when they did not object to a National Center for Missing and Exploited Children (NCMEC) CyberTipline report being admitted into evidence; (3) whether, despite lack of objection, the military judge erred by admitting the CyberTipline report into evidence; and (4) whether the Air Force violated Appellant's right to a speedy trial when it did not docket his record with this court within 150 days of his sentence.

## I. BACKGROUND

Appellant was stationed at Cannon Air Force Base (AFB), New Mexico, at the time of the offense for which he was convicted. On 4 May 2020, NCMEC sent the New Mexico Attorney General's Office (NMAGO) a CyberTipline report regarding suspected Internet child exploitation involving an Internet Protocol (IP) address in Clovis, New Mexico. The assigned NMAGO analyst, Ms. HR, notified local law enforcement in Clovis, New Mexico, and was told that Air Force Office of Special Investigation (AFOSI) agents at Cannon AFB were already investigating the case. Thereafter, Ms. HR forwarded the CyberTipline report to AFOSI agents.

According to the CyberTipline report, someone used the IP address issued to an Air Force member, Mr. AS,[2] to conduct a reverse image Internet search using a known image of child pornography.[3] Appellant shared Mr. AS's residence and Internet access; the CyberTipline report did not specify the identity of the Internet user who conducted the reverse image search. AFOSI agents

---

[1] The court-martial found Appellant not guilty of one specification of possessing child pornography in violation of Article 134, UCMJ.

[2] Mr. AS was an active-duty Air Force member during the investigation but had separated from the service by the time of the court-martial. Mr. AS was a civilian when he testified at Appellant's court-martial.

[3] This particular search engine allows users to provide an image, after which the program will return search results of similar images.

arrested Mr. AS and searched his electronic devices. Although he was their initial primary suspect, agents ultimately determined Mr. AS had not viewed or possessed child pornography. AFOSI agents also interviewed Appellant, who denied viewing or possessing child pornography and consented to a search of his electronic devices.

AFOSI agents sent Appellant's devices to the DoD Cyber Crime Center (DC3). During the analysis of Appellant's laptop, which was named "Derek-PC" and was password protected, DC3 analysts discovered seven still images of suspected child pornography.[4] These seven still images were located in the laptop's Mozilla Firefox Internet browser cache folder and had been automatically cached by the web browser on or about 18 July 2018. DC3 analysts did not find the image of known child pornography that triggered the CyberTipline report regarding Appellant's laptop. DC3 analysts, however, did discover five still images similar to the CyberTipline image in the laptop's Google Chrome cache.

According to the Government's digital forensic expert, Mr. BM, when a computer user goes to an Internet website containing images, the Internet web browsers automatically save image files to cache folders specific to that particular browser. A computer user does not control what images are stored in the browser cache folder and, while a user can delete all files in the cache folder, a user cannot delete specific files from browser cache. Furthermore, an average computer user cannot access files located in browser cache.

When the suspected images of child pornography were cached, the laptop's web browsers were caching approximately 80 images per minute. The seven charged still images of suspected child pornography were among over 1700 total images in the Internet web browser cache of Appellant's laptop. The seven charged images were all "thumbnails," and all had creation timestamps of 18 July 2018, between 5:20:23 a.m. and 5:40:56 a.m. Two still images were created simultaneously in a web browser cache folder, and a third was created four seconds later.

Mr. BM conceded that the presence of an image in an Internet web browser cache does not prove that a user had seen the file, and that non-pornography searches might lead a computer user to pornographic images. Mr. BM also found no data-wiping or deleting software on Appellant's laptop. No testimony was presented regarding whether Appellant's laptop had been connected to Mr. AS's IP address.

---

[4] None of Appellant's devices besides his Alienware laptop contained suspected child pornography.

However, the DC3 analysis discovered that, also on 18 July 2018, the user of the laptop's "Derek" user profile had entered search terms commonly associated with child pornography into multiple Internet web browsers. According to Ms. HR, locating child pornography on the Internet is "pretty difficult . . . without seeking it out" because Internet platforms and service providers diligently remove such content to avoid fines.

A pediatrician, Dr. JS, reviewed the seven still images and testified that the persons depicted in six of them ranged between approximately 5 and 11 years of age. However, Dr. JS was unable to give a specific age for the seventh image because of the individual's body position. The Government produced evidence that the girls in these still images were photographed in ways that constitute "sexually explicit conduct" as defined in the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 95.c.(10).[5]

In addition to the seven still images, DC3 analysts discovered a partially downloaded video of apparent child pornography in the "downloads" folder of the "Derek" user profile on Appellant's laptop. The partial video is seven minutes and 48 seconds in length, and the suspected child pornography begins four minutes and seven seconds into the video. At that point, the young female in the partial video begins taking actions that constitute "sexually explicit conduct" as defined in the *MCM*, pt. IV, ¶ 95.c.(10).

According to Mr. BM, the partially downloaded video was playable on VLC media player, had been loaded by the VLC media player on Appellant's laptop, and was created by the computer user in the "downloads" folder of the computer on 24 April 2018. Mr. BM testified that, on 16 April 2020, a Windows link file—a shortcut that points to a file and shows that the file was "interacted with" by a computer user—was created for the partial video. However, Mr. BM also testified that the partially downloaded video was corrupted and would likely give the user an error message if the user tried to play it.

Dr. JS reviewed the partially downloaded video and testified that the young female in the video was probably 15 or 16 years of age. However, Dr. JS also testified that the young female had "completed puberty" and could be 18 years of age.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

---

[5] We find it unnecessary to describe the graphic content of the still images and partial video in detail.

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The offense of viewing child pornography under Article 134, UCMJ, as charged in Appellant's case, requires the following elements: (1) knowingly and wrongfully viewing child pornography; and (2) under the circumstances, the conduct is of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 95.b.(1).

Child pornography is "material that contains either an obscene visual depiction of a minor engaging in sexually explicit conduct or a visual depiction of an actual minor engaging in sexually explicit conduct." *MCM*, pt. IV, ¶ 95.c.(4). A minor is "any person under the age of 18 years." *MCM*, pt. IV, ¶ 95.c.(7).

"Sexually explicit conduct" means actual or simulated:

(a) sexual intercourse or sodomy, including genital to genital, oral to genital, anal to genital, or oral to anal, whether between persons of the same or opposite sex;

(b) bestiality;

(c) masturbation;

(d) sadistic or masochistic abuse; or

(e) lascivious exhibition of the genitals or pubic area of any person.

*MCM*, pt. IV, ¶ 95.c.(10).

To be convicted of viewing child pornography, an appellant must be "aware that the images were of minors, or what appeared to be minors, engaged in sexually explicit conduct." *MCM*, pt. IV, ¶ 95.c.(5). "Awareness may be inferred from circumstantial evidence such as . . . search terms used" by the appellant. *Id.*

**2. Analysis**

Appellant challenges the legal and factual sufficiency of his conviction for viewing child pornography, arguing that the Prosecution failed to prove he viewed the seven still images or the single partially downloaded video file.

Having given full consideration to Appellant's arguments and drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the members personally observed the witnesses and we did not, we also find the evidence factually sufficient.

We first address the nature of the seven still images and the partially downloaded video file charged in this case and whether the evidence is legally and factually sufficient to prove that they are, in fact, child pornography. As noted above, the Government introduced evidence that the girls depicted in the seven still images engaged in what constitutes sexually explicit conduct. Dr. JS testified that the girls depicted in six of the seven still images ranged from approximately 5 to 11 years of age but was unable to give a specific age for the seventh image because of the girl's body position. The young female depicted in the partially downloaded video was also engaged in sexually explicit conduct in the video. Dr. JS testified that this young female was probably 15 or 16 years of age but conceded that she had "completed puberty" and could be 18 years of age. The court has reviewed all of these images, as did the members. Drawing every reasonable inference from the evidence in favor of the Government and weighing the evidence ourselves, we conclude that the evidence is legally and

factually sufficient to prove that the video and multiple image files "were of minors, or what appeared to be minors, engaged in sexually explicit conduct" and constitute child pornography as defined in the *MCM*, pt. IV, ¶ 95.c.(5).

We next address whether the evidence was legally and factually sufficient to prove that Appellant wrongfully viewed these images of child pornography and that his actions were of a nature to bring discredit upon the armed forces. As noted above, the Government produced no direct evidence that Appellant viewed these images of child pornography. There was no eyewitness to the viewing. Mr. BM could not place Appellant in control of the laptop when the still images were cached, or when the partial video was created on the laptop or subsequently "interacted with" by the computer user. Mr. BM conceded that the presence of an image in a browser cache does not prove the user has seen the file, and that non-pornography searches might bring up pornographic images. Mr. BM also found no data-wiping or deleting software on Appellant's laptop. No testimony was presented regarding whether or not Appellant's laptop had been connected to Mr. AS's IP address.

However, as noted above, on 18 July 2018—the same day that the seven charged still images were cached, someone using the "Derek" user profile of Appellant's laptop typed search terms commonly associated with child pornography—many of which sound like child pornography to the layperson's ear—into multiple Internet browsers.

DC3 analysts discovered the partially downloaded video that had been created in the "downloads" folder of the "Derek" user profile on Appellant's laptop on 24 April 2018. Based on Mr. BM's testimony, the partial video was playable on a VLC media player and had been loaded by the VLC media player installed on Appellant's laptop. Nearly two years after the file was created, on 16 April 2020, a user of Appellant's laptop "interacted with" the video file.

Appellant's actions drew the attention of non-Air Force entities such as NCMEC, NMAGO, and Clovis law enforcement. Furthermore, when asked how an Air Force member being the subject of a child pornography investigation affected her view of the Air Force, Ms. HR testified that she found it "sad and disheartening" and that she had "high expectations for our military—the members of the military."

Drawing every reasonable inference from the evidence in favor of the Government for our legal sufficiency review and weighing the evidence ourselves for our factual sufficiency review, we conclude that the evidence was legally and factually sufficient to prove that Appellant viewed the still images and partially downloaded video, that Appellant's conduct was of a nature to bring discredit upon the armed forces, and to support Appellant's conviction for viewing child pornography.

**B. Claimed Ineffective Assistance of Counsel**

**1. Additional Background**

Appellant next asserts that trial defense counsel were constitutionally ineffective by failing to object to admission of the NCMEC CyberTipline report. It is uncontroverted that the CyberTipline report contained testimonial hearsay statements offered to prove the truth of the matter asserted therein. It is likewise uncontroverted that trial defense counsel did not object to the report's admission as evidence.

**2. Law**

The Sixth Amendment[6] of the United States Constitution guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if appellant's allegations are true, whether there is a reasonable explanation for counsel's actions; (2) if appellant's allegations are true, whether defense counsel's level of advocacy fell measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, whether there is a reasonable probability

---

[6] U.S. CONST. amend. VI.

that, absent the errors, there would have been a different result. *Gooch*, 69 M.J. at 362 (citing *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). Considering the last question, "[i]t is not enough to show that the errors had some conceivable effect on the outcome;" instead, the reasonable probability must be "a probability sufficient to undermine confidence in the outcome," including "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

### 3. Analysis

Appellant provided a declaration in support of his claim of ineffective assistance of counsel. As ordered by the court, both trial defense counsel, Captain (Capt) VC and Capt AB, provided declarations responding to Appellant's claim. The court granted motions to attach these declarations to the record.[7] Considering the record, including these declarations, we conclude that there exists a reasonable explanation for trial defense counsel's decision not to object to admission of the CyberTipline report. We further conclude that trial defense counsel's level of advocacy did not fall measurably below the performance ordinarily expected of fallible lawyers. Finally, we conclude that Appellant has not met the required showing of prejudice.

In her declaration, Capt VC explains her rationale for not objecting to the CyberTipline report as follows:

> The decision not to object to the CyberTipline report was intentional and strategic. The inclusion of this evidence was the bedrock of the trial defense team's theory and our goal to identify a potential "scapegoat" for the alleged misconduct and create doubt in the minds of the members.
>
> First, the CyberTipline report line report tied the IP address associated with the suspected child pornography to [Mr. AS], [Appellant]'s roommate. The inclusion of this evidence allowed trial defense to make good faith arguments that [Mr. AS] was the potential offender or "scapegoat" who the Government could not rule out as the actual offender.
>
> Second, and more importantly, this evidence was critical to the [D]efense's theory, fully explored in both my cross[-]examination of the [DC3] expert as well as my closing argument, that the

---

[7] We considered the declarations in accordance with *United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020) (observing a Court of Criminal Appeals is allowed to accept affidavits "when necessary for resolving claims of ineffective assistance of trial defense counsel").

Government never found the images from the CyberTipline report on [Appellant]'s computer. Without evidence of those images actually on [Appellant]'s computer, trial defense was able to illustrate in cross[-]examination that forensic examiners were just hunting for any shred of evidence of potential child pornography. Then, in closing, I was able to argue that the forensic examiners found only thumbnails from search results, and the Government could not prove beyond a reasonable doubt [Appellant] had actually viewed the alleged child pornography. Without the CyberTipline report, the trial defense's scapegoat argument would have been much less compelling. Moreover, our arguments regarding the Government's behavior in hunting for—and then charging—a few thumbnails when they could not tie the CyberTipline report images to [Appellant]'s computer would have been substantially weakened.

During my conversations with our defense digital forensic expert, Ms. [CP], and the Government's digital forensic expert, my understanding was that [reverse] "visual search" was a means for searching akin to typing in search terms, pasting a URL, or dragging an image into the search box either from the user's computer or from another web browser. Using this search engine in this manner does not amount to a transferring of the image's ownership and it is therefore not distribution. This understanding bolstered the defense team's decision not to object to the inclusion of references to "visual search" in the CyberTipline report.

Capt AB's declaration contained substantially the same information regarding the trial defense team's decision to not object to admission of the evidence.

As discussed above, we will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *See Mazza*, 67 M.J. at 475. Appellant bears the burden to demonstrate both deficient performance and prejudice. *Id.* Trial defense counsel's decision here constituted a strategic decision regarding which defense to mount. This decision was reasonable under the circumstances. We will not second-guess this decision and find neither deficient performance nor prejudice.

## C. Trial Judge's Admission of the "CyberTipline Report"

Appellant next claims that, despite lack of objection, the military judge erred by admitting the CyberTipline report and that this error violated Appellant's constitutional right to confront witnesses against him.

**1. Law**

"When an appellant does not raise an objection to the admission of evidence at trial, we first must determine whether the appellant waived or forfeited the objection." *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018) (citation omitted).

> Waiver usually occurs when there is an intentional relinquishment or abandonment of a known right . . . . When an appellant fails to raise a Confrontation Clause objection at trial, [appellate courts consider] the particular circumstances of the case to determine whether there was waiver but appl[y] a presumption against finding a waiver of constitutional rights.

*United States v. Bench*, 82 M.J. 388, 392 (C.A.A.F. 2022) (alterations, internal quotation marks, and citations omitted). "A waiver of a constitutional right is effective if it clearly established that there was an intentional relinquishment of a known right." *Jones*, 78 M.J. at 44 (internal quotation marks and citation omitted).

Our superior court has held that, in instances of waiver, we remain obliged under Article 66, UCMJ, 10 U.S.C. § 866, to "assess the entire record to determine whether to leave [Appellant's] waiver intact, or to correct [an] error." *United States v. Hardy*, 76 M.J. 732, 737 (C.A.A.F. 2017) (quoting *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016)).

If we find that an appellant did not waive an issue but merely forfeited it, we review for plain error. *See United States v Sweeney*, 70 M.J. 296, 304 (C.A.A.F. 2011). Plain error occurs "where (1) there was error, (2) the error was plain and obvious, and (3) the error materially prejudiced a substantial right of the accused." *Id.* (citation omitted).

**2. Analysis**

Again, it is undisputed that the CyberTipline report contained testimonial hearsay and that it was admitted into evidence without objection. Appellant contends that trial defense counsel's non-objection to the CyberTipline report was not a strategic decision and therefore constituted forfeiture and not waiver. Appellant further contends that the quantity of trial defense counsel's other objections shows that the non-objection to the CyberTipline report was a mistake by counsel.

In support of his argument, Appellant states in his declaration: "In the week leading up to my trial, I remember discussing the [CyberTipline report] with my attorneys, but I do not remember my attorneys telling me they would not object to its admission." Appellant further states that the discussion of the CyberTipline report was "extremely limited" and that he "did not knowingly

waive [his] right to object to the report's admission or [his] Confrontation Clause rights."

As discussed above, we find trial defense counsel's decision not to object to the CyberTipline report a strategic one. Further explaining the strategy, Capt VC states in her declaration that "[t]he choice not to object to the CyberTipline report line report generally *and* specifically on confrontation grounds was a strategic one" wherein "the trial defense team wielded objections (including those of a constitutional magnitude) as a scalpel to a strategic end." She further explained that she made the decision to object to the DC3 report regarding Mr. AS (an objection sustained by the military judge) but not to object to the CyberTipline report because the DC3 report undermined the "scapegoat" defense, while the CyberTipline report cited Mr. AS as a potential suspect.

Because we find trial defense counsel's decision not to object to the CyberTipline report was both intentional and strategic and that Appellant's right to confront the witness or witnesses who drafted the CyberTipline report was intentionally relinquished for strategic reasons, we further find that Appellant waived this issue at trial.

However, even had we found that Appellant forfeited the issue rather than waived it, and reviewing for plain error, we would find no error, much less one that was "plain and obvious." *Sweeney*, 70 M.J. at 304. Had the military judge *sua sponte* refused admission of the CyberTipline report, she would have inappropriately inserted herself into the defense strategy and potentially undermined the primary defense theory. Had the military judge taken a lesser course of action and asked specific questions about waiver of the confrontation right, she would have placed the Defense in the unenviable position of having to discuss its trial strategy prematurely. Under the circumstances, we find that the military judge acted appropriately and committed no error. Consequently, Appellant's argument would also fail under plain error review.

### D. Post-Trial Delay

Appellant was sentenced on 10 September 2021. However, the record of trial was not docketed with this court until 10 February 2022. This 153-day lapse exceeded the 150-day threshold for a facially unreasonable post-trial delay this court established in *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020). Accordingly, we have considered the four factors identified in *United States v. Moreno* to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." 63 M.J. 129, 135 (C.A.A.F. 2006) (first citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); then citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "We

review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *Id*. (citations omitted).

*Moreno* identified three types of prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id*. at 138–39 (citations omitted). However, Appellant does not allege any specific prejudice from the delay in this case, and we perceive none. Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). Having considered all the circumstances, although the post-trial processing of Appellant's case could have been accomplished more rapidly, we do not find the delay so egregious as to impugn the fairness or integrity of the military justice system.

Recognizing our authority under Article 66, UCMJ, we have also carefully considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After evaluating the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

13